**No. 24-1656**

*In the*
United States Court of Appeals
*for the* Fourth Circuit

_____

LAQUITA OLIVER, *et al.*

v.

NAVY FEDERAL CREDIT UNION

_____

**APPELLANTS' OPENING BRIEF**

*Appeal from the United States District Court for the Eastern District of Virginia, Civil Action No. 23-cv-1731*

Hassan A. Zavareei
Glenn E. Chappell
**TYCKO & ZAVAREEI LLP**
2000 Pennsylvania Avenue NW
Suite 1010
Washington, D.C. 20006
Tel. 202-973-0900
hzavareei@tzlegal.com
gchappell@tzlegal.com

Adam J. Levitt
Daniel R. Schwartz
**DiCELLO LEVITT LLP**
Ten North Dearborn Street
Sixth Floor
Chicago, Illinois 60602
Tel. 312-214-7900
alevitt@dicellolevitt.com
dschwartz@dicellolevitt.com

Ben Crump
**BEN CRUMP LAW PLLC**
122 South Calhoun Street
Tallahassee, Florida 32301
Tel. 850-224-2020
ben@bencrump.com

*Counsel for Plaintiffs*

*(Additional counsel listed on signature page)*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Appellants certify that they are all natural persons.

## TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................1

QUESTION PRESENTED .......................................................................4

JURISDICTIONAL STATEMENT ...........................................................4

STATEMENT OF THE CASE.................................................................5

I.     Navy Federal's Own Data Reveal Significant Racial Disparities in Mortgage Lending .............................................................5

II.    Plaintiffs File Suit to End Navy Federal's Discriminatory Practices..............7

III.   Navy Federal Moves to Dismiss the CAC and Strike the Class Claims .........9

IV.   The District Court Allowed Individual Claims to Proceed And Permanently Struck Without Explanation Class Claims Based on the Same Underlying Data ............................................................10

ARGUMENT ......................................................................................11

I.     Class Allegations Cannot Be Struck Absent Finding That No Set Of Facts Could Possibly Support Class Action .................................11

II.    Plaintiffs Support The Plausible Existence Of Class Claim ........................14

     A.    Plaintiffs Stated Disparate Impact Discrimination Claim as to Themselves ...............................................................14

     B.    The District Court's Internally Inconsistent Ruling Relied On Impermissible Fact-Finding ................................................16

     C.    Existence Of Some Variables Is No Barrier To Class Certification .........................................................................19

CONCLUSION ...................................................................................25

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ........................................................................24

*Betsey v. Turtle Creek,*
  736 F.2d 983 (4th Cir. 1984) .........................................................14

*Brown v. Nucor Corp.,*
  785 F.3d 895 (4th Cir. 2015) .........................................................20

*Buycks-Roberson v. Citibank Fed. Sav. Bank,*
  162 F.R.D. 322 (N.D. Ill. 1995) ............................................... 23, 24

*Chaney v. Crystal Beach Cap., LLC,*
  2011 WL 17639 (M.D. Fla. Jan. 4, 2011) .....................................13

*Chen-Oster v. Goldman, Sachs & Co.,*
  877 F. Supp. 2d 113 (S.D.N.Y. 2012) ...........................................21

*Cholakyan v. Mercedes-Benz USA, LLC,*
  796 F. Supp. 2d 1220 (C.D. Cal. 2011) .........................................21

*Cnty. of Cook v. HSBC N. Am. Holdings Inc.,*
  314 F. Supp. 3d 950 (N.D. Ill. 2018) ............................................16

*Coleman v. General Motors Acceptance Corp.,*
  220 F.R.D. 64 (M.D. Tenn. 2004) ..................................................23

*Cooper v. S. Co.,*
  390 F.3d 695 (11th Cir. 2004) .......................................................20

*Costa v. Dvinci Energy, Inc.,*
  342 F.R.D. 38 (D. Mass. 2022) ......................................................25

*Damasco v. Clearwire Corp.,*
  662 F.3d 891 (7th Cir. 2011) .........................................................13

*DeHoyos v. Allstate Corp.,*
  240 F.R.D. 269 (W.D. Tex. 2007) ............................................ 16, 20

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.,*
  637 F.3d 435 (4th Cir. 2011) .........................................................18

*Edwards v. City of Goldsboro,*
  178 F.3d 231 (4th Cir. 1999) .........................................................17

*Ehrhart v. Synthes (USA)*,
    2007 WL 4591276 (D.N.J. Dec. 28, 2007) ........................................................13

*Ehrhart v. Synthes (USA)*,
    No. CIV.A. 07-01237(SDW), 2007 WL 4591276 (D.N.J. Dec. 28, 2007)..........12

*Fengler v. Crouse Health Found., Inc.*,
    595 F. Supp. 2d 189 (N.D.N.Y. 2009) ................................................................25

*Fischer v. Dallas Fed. Sav. & Loan Ass'n*,
    106 F.R.D. 465 (N.D. Tex. 1985)........................................................................23

*Gen. Tel. Co. v. Falcon*,
    457 U.S. 147 (1982) ............................................................................................13

*Glass v. Tradesmen Int'l, LLC*,
    505 F. Supp. 3d 747 (N.D. Ohio 2020) ..............................................................21

*Graves v. Sw. & Pac. Specialty Fin., Inc.*,
    2013 WL 5945851 (N.D. Cal. Nov. 4, 2013).......................................................13

*Huskey v. State Farm Fire & Cas. Co.*,
    No. 22 C 7014, 2023 WL 5848164 (N.D. Ill. Sept. 11, 2023) ............................20

*In re NVIDIA GPU Litig.*,
    No. C 08–04312 JW, 2009 WL 4020104 (N.D.Cal. Nov. 19, 2009)...................22

*In re Saturn L–Series Timing Chain Prods. Liab. Litig.*,
    No. MDL 1920, 08:07CV298, 08:08CV79, 2008 WL 4866604
    (D.Neb. Nov. 7, 2008) .........................................................................................21

*In re Wal–Mart Stores, Inc. Wage & Hour Litig.*,
    505 F.Supp.2d 609 (N.D. Cal. 2007)...................................................................22

*Krakauer v. Dish Network, L.L.C.*,
    925 F.3d 643 (4th Cir. 2019) ..............................................................................22

*Louis v. Saferent Sols., LLC*,
    685 F. Supp. 3d 19 (D. Mass. 2023)....................................................................20

*Manning v. Bos. Med. Ctr. Corp.*,
    725 F.3d 34 (1st Cir. 2013) .................................................................................12

*Messner v. Northshore Univ. HealthSystem*,
    669 F.3d 802 (7th Cir. 2012)...............................................................................24

*Microsoft Corp. v. Baker*,
    582 U.S. 23 (2017) ................................................................................................5

iii

*Monreal v. Potter*,
  367 F.3d 1224 (10th Cir. 2004) ....................................................................13

*Montgomery Cnty., Maryland v. Bank of Am. Corp.*,
  421 F. Supp. 3d 170 (D. Md. 2019) .............................................................16

*Nat'l Fair Hous. All. v. Bank of Am., N.A.*,
  2023 WL 2633636 (D. Md. Mar. 24, 2023) ..................................................16

*Pilgrim v. Universal Health Card, LLC*,
  660 F.3d 943 (6th Cir. 2011) .......................................................................12

*Pittman v. E. I. duPont de Nemours & Co.*,
  552 F.2d 149 (5th Cir. 1977) .......................................................................12

*Prince George's Cnty., Maryland v. Wells Fargo & Co.*,
  397 F. Supp. 3d 752 (D. Md. 2019) .............................................................16

*Reyes v. Waples Mobile Home Park Ltd. P'ship*,
  903 F.3d 415 (4th Cir. 2018) ................................................................ 14, 15

*Sanders v. Apple Inc.*,
  672 F. Supp. 2d 978 (N.D. Cal. 2009) .........................................................12

*Simpson v. Dart*,
  23 F.4th 706 (7th Cir. 2022) ........................................................................20

*Smith v. Wash. Post. Co.*,
  962 F.Supp.2d 79 (D.D.C. 2013) ...................................................................2

*Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*,
  576 U.S. 519 (2015) .............................................................................. 14, 19

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) .....................................................................................21

*Williams v. State Farm Mut. Auto. Ins. Co.*,
  No. 20 CV 1121, 2023 WL 5748421 (N.D. Ill. Sept. 6, 2023) ....................21

**Other Authorities**

1 *Newberg and Rubenstein on Class Actions* § 3:18 (6th ed.) .............................22

*Wright, Miller & Kane, Federal Practice & Procedure Civil* § 1785.3
  (3d. 2005) ................................................................................................ 2, 13

**INTRODUCTION**

In this disparate impact racial discrimination action, Plaintiffs are members of racial or ethnic minority groups who sought loans from Navy Federal Credit Union ("Navy Federal" or "Defendant"), one of the largest home mortgage lenders in the United States. They allege Navy Federal's underwriting policy—effectively, its proprietary algorithm used to evaluate *all* home loan candidates, regardless of applicant or loan type—causes it systematically to reject otherwise qualified non-White borrowers like Plaintiffs, or subjects borrowers like Plaintiffs to unfavorable terms as compared to White borrowers. Plaintiffs filed a Consolidated Amended Complaint ("CAC") under both federal and state civil rights laws, including the Fair Housing Act ("FHA") and the Equal Credit Opportunity Act ("ECOA"). The CAC was supported by three regression-controlled studies of Navy Federal's own Home Mortgage Disclosure Act ("HMDA") data showing lending disparities that apply across the entire putative class population.

Following Defendant's motion to dismiss, the district court recognized that Plaintiffs each stated a claim of "disparate impact" under federal law, crediting that "the statistical disparities [alleged in the CAC] reveal a disparate impact among non-white loan applicants and the underwriting algorithm and process is alleged to have caused the disparity." JA116.

However, the district court *sua sponte* struck Plaintiffs' class allegations under

Rule 23(d)(1)(D), with no explanation beyond stating it was doing so "[b]ecause the circumstances of each plaintiff's loan application process are so varied." JA122.

The district court's extraordinary decision to permanently strike the class allegations constituted clear and manifest error meriting immediate reversal.

Courts around the country agree that striking class allegations at the pleading stage is a "disfavored, drastic remedy," *Smith v. Wash. Post. Co.*, 962 F.Supp.2d 79, 89–90 (D.D.C. 2013), since, to strike class allegations at the pleading stage, a court must, at minimum, conclude that there exists no set of facts possibly revealed by discovery under which any kind of class case could possibly proceed. As a result, "[a]s a practical matter, the court's [certification decision] usually should be predicated on more information than the complaint itself affords…" 5C Wright, Miller & Kane, Federal Practice & Procedure Civil 3d § 1785.3.

The need for discovery is particularly present here, since the district court itself had found Plaintiffs successfully alleged a "disparate impact" as to themselves. That means that Plaintiffs successfully alleged (1) class-wide "statistical disparities" showing a disparate impact and (2) connected those disparities to Defendant's "underwriting algorithm and process," JA116—a process and policy that Plaintiffs explained is uniform in character and applied to the entire putative class. Plaintiffs' allegations reveal that it is at least plausible that a class could be certified following appropriate discovery. At bottom, the district court's apparent conclusion that a

disparate impact claim involving a "process [that is] varied" cannot be brought has no basis in the law.

To rule otherwise, the district court made numerous errors. First, it engaged in the kind of roving fact-finding prohibited by Rule 12. Plaintiffs alleged they were subject to the *same, uniform*, underwriting policy. JA044-53 ¶¶ 63-67, 89. Yet the district court apparently made a factual assumption—untethered from, and directly contradicted by, the CAC's allegations—that unalleged "circumstances" of each Plaintiff's "process" were "varied" in a manner that somehow precluded their treatment as a class. This fact-finding alone merits reversal.

Further, the result of that fact-finding was a hopelessly internally inconsistent Order. In a world where plaintiffs *can* successfully allege that Navy Federal's loan underwriting policy, applied to all borrowers, harmed the named Plaintiffs due to their race or ethnicity, it is fundamentally inconsistent for the Court to find that there exists no set of facts in which that same policy – again, *applied to all borrowers* – similarly harms the absent class members due to their race or ethnicity.

Finally, the district court's apparent assumption that the existence of a multi-variable underwriting process somehow precludes certification *no matter what discovery reveals* has no basis. Courts around the country have routinely certified disparate impact classes involving "varied" circumstances, *including* cases involving the application of algorithms involving multiple variables. Further, and as

multiple circuit courts have explained, if the district court's concern at this early of a stage is that the class definition is too broad, the solution is later to refine it, not to excise class allegations from the complaint in their entirety.

Ultimately, the district court recognized that Plaintiffs stated a claim that Navy Federal's loan underwriting process causes a disparate impact as to themselves. Plaintiffs should be afforded the opportunity in discovery to show that the disparate impact harms absent class members as well. The Court should reverse the district court's Order permanently striking Plaintiffs' class allegations.

## QUESTION PRESENTED

Where the named Plaintiffs successfully alleged that a common policy, applied to all class members, caused a racially disparate impact as to the named Plaintiffs, did the district court err when it *sua sponte* struck the Consolidated Amended Complaint's allegations that absent class members, who were subject to the same common policy as the named Plaintiffs, also suffered a racially disparate impact?

## JURISDICTIONAL STATEMENT

This interlocutory appeal is brought pursuant to Rule 23(f) of the Federal Rules of Civil Procedure, which gives this Court jurisdiction to review an order granting or denying class-action certification. "An order striking class allegations is functionally equivalent to an order denying class certification and therefore

appealable under Rule 23(f)." *Microsoft Corp. v. Baker*, 582 U.S. 23, 34 (2017) (cleaned up). This Court granted Plaintiffs' petition for appeal on July 17, 2024.

## STATEMENT OF THE CASE

### I. Navy Federal's Own Data Reveal Significant Racial Disparities in Mortgage Lending

Navy Federal is by far the largest credit union in the country, and has more than 13 million members, primarily active-duty military, military families, and veterans. JA025 ¶¶ 5-6. It is also one of the country's largest mortgage lenders. In 2022 alone, Navy Federal originated almost 50,000 mortgage loans for $16.5 billion. JA045 ¶ 65.

Like all mortgage lenders, Navy Federal is required yearly to retain and to submit robust data to the Consumer Financial Protection Bureau pursuant to the Home Mortgage Disclosure Act ("HMDA"). JA046 ¶ 69. That HMDA data (in anonymized form) is in turn released to the public. *Id.*

Multiple studies of that data have revealed significant racial disparities in Navy Federal's mortgage lending. JA046-50 ¶¶ 71, 74-80. A December 2023 study of Navy Federal's 2022 HMDA data found that while Navy Federal approved mortgage applications for 77% of White applicants, it approved mortgage applications for only 48% of Black applicants, 56% of Latino applicants, and 64% of Native American applicants. JA048-49 ¶ 76. Further, a White applicant to Navy Federal with an annual income of $61,000 or less was more likely to be approved

for a Navy Federal mortgage than a Black applicant with an annual income of $140,000 or more. JA049 ¶ 77. The study further revealed that, as compared to other major lending institutions, Navy Federal had by far the largest racial gap in loan approvals. JA050 ¶ 80. A regression analysis controlling for more than a dozen variables found that Black applicants were more than twice as likely to be denied a loan by Navy Federal than similarly situated White applicants, and Latino applicants were 85% more likely to be denied. JA048-50 ¶¶ 74-80.

The December 2023 study results were part of a pattern. In November 2022, the National Credit Union Administration ("NCUA"), Navy Federal's regulator, published research on "mortgage lending disparities to credit union members of color." JA046 ¶ 70. That study revealed that, even taking credit score into consideration, in 2020 and 2021 minority applicants for mortgages from credit unions like Navy Federal were denied mortgages at nearly twice the rate of similarly-qualified White people. JA046-47 ¶ 71. It also showed that when minority applicants were issued loans, the loans were more expensive (i.e., characterized by a higher interest rate) than those of similarly qualified White borrowers. JA051 ¶ 85. Navy Federal's data necessarily dominated the data set analyzed by the NCUA, since Navy Federal is orders of magnitude larger than all other US credit unions (it is roughly the size of the second through fourth largest credit unions combined). JA046-47 ¶ 71. Finally, in a statistical analysis performed by the organization The Markup,

Navy Federal's publicly available 2019 HMDA Data showed that Navy Federal was *more than twice as likely* to deny Black applicants who applied for more mortgages as compared to White applicants, even when holding seventeen independent variables constant. JA047-48 ¶ 73.

All told, multiple studies revealed the existence of serious, and long-unaddressed, racial disparities in Navy Federal's lending practices. They also revealed that Navy Federal was an outlier: the racial disparities in lending at Navy Federal were far greater than at any other major lending institution.[1] JA046-50 ¶¶ 71, 73, 74-81.

## II.    Plaintiffs File Suit to End Navy Federal's Discriminatory Practices

Plaintiffs filed their CAC on February 20, 2024. Each of the nine named Plaintiffs is Black or Latino, applied for a home loan with Navy Federal, was qualified for the loan sought, but was denied due to their race (or, in the case of Plaintiff Batchelor, offered a loan on worse terms). JA057-70 ¶¶ 106-239. Indeed, multiple Plaintiffs were unable to secure loans from Navy Federal, were forced to scramble for new loans from other lending institutions, and were then able to secure loans from those other institutions, evidencing their qualification for the loans they

---

[1]For example, and as further detailed in the CAC, the racial gap in lending as between Black and White applicants for 30-year fixed mortgage loans in 2022 at Navy Federal was 29% (48% approval vs. 77% approval), while at Bank of America, the gap was 3%. JA050 ¶ 81.

sought. *Id*.

The CAC alleges Navy Federal has a unique, proprietary, and secret process for underwriting its home mortgage loans that applies to all prospective borrowers and that produces these disparate outcomes. JA044-46 ¶¶ 63-68. While the complete details of that underwriting process are not presently known to Plaintiffs, *id*. ¶ 64, Plaintiffs alleged what *is* known: (1) Navy Federal has a "semi-automated" underwriting process; (2) that underwriting process utilizes a propriety algorithm that considers a host of variables that can be proxies for race; (3) the outputs from the algorithm are used by Navy Federal to make decisions regarding borrowing eligibility and credit terms, including for Plaintiffs; (4) the underwriting process is substantially the same for each of the loan types sought by the named Plaintiffs and members of the putative classes; and (5) this underwriting process is responsible for the disparate impacts experienced by Plaintiffs and the putative classes. JA044-53 ¶¶ 63-67, 89.

Plaintiffs accordingly filed claims for race discrimination under both federal and state civil rights statutes, including the FHA and ECOA. The CAC includes class claims brought pursuant to Rules 23(a), 23(b)(2), 23(b)(3), and, as applicable, 23(c)(4) seeking damages and declaratory/injunctive relief for the following national class:

> All minority residential loan applicants from 2018 through the present (the "Class Period") who submitted an application for any home

mortgage loan to Defendant, who sought to refinance or modify a home mortgage loan through Defendant, and/or who sought a Home Equity Line of Credit from Defendant and whose application was: (a) denied; (b) approved at higher interest rates and/or subject to less favorable terms as compared to similarly situated non-minority applicants; or (c) processed at a rate slower than the average processing time of applicants submitted by similarly situated non-minority applicants.

JA070 ¶ 241. Similar state specific subclasses are alleged for applicants in Florida and California, JA070-71 ¶¶ 242-243, and Plaintiffs expressly reserved their right to amend these definitions over the course of the litigation. JA071 ¶ 244.

## III.    Navy Federal Moves to Dismiss the CAC and Strike the Class Claims

On March 21, 2024, Navy Federal moved to dismiss the CAC and to strike the class allegations. With respect to the motion to strike, Navy Federal offered two arguments. First, it argued that the class allegations should be struck in their entirety because a notice provision in the Navy Federal Membership Agreement should preclude any claims by absent class members. Dist. Ct. ECF No. 65 at 21-22. Second, it argued that the class allegations should be *limited* to the loans and minority groups specifically represented by Plaintiffs. In other words, Navy Federal argued that because the named Plaintiffs were either Black or Latino, they cannot represent the interests of, e.g., Native American borrowers, and because none of the named Plaintiffs had sought, for example, a Home Equity Line of Credit, they could not represent absent class members who sought Home Equity Lines of Credit as opposed to the loan types sought by Plaintiffs. *Id*. at 22-23.

9

IV.    **The District Court Allowed Individual Claims to Proceed And Permanently Struck Without Explanation Class Claims Based on the Same Underlying Data**

The district court granted in part and denied in part Navy Federal's motion. It held that Plaintiffs' individual disparate impact claims under the FHA, ECOA, and for declaratory judgment could proceed, but dismissed Plaintiffs' disparate treatment theory of liability and the state law claims. JA123. In allowing the FHA and ECOA claims to proceed, the district court reasoned that "the statistical disparities [alleged in the CAC] reveal a disparate impact among non-white loan applicants and the underwriting algorithm and process is alleged to have caused the disparity." JA116.

The district court also addressed and rejected the sole argument Defendant proffered to strike the class allegations in their entirety. Defendant argued that a notice provision in the Navy Federal Membership Agreement precluded class claims because, they contended, the provision would have required absent class members to provide "notice" of a grievance prior to becoming members of a class. The district court found that this notice provision, even if applicable, was unenforceable because such notice would have been futile.[2] JA121.

However, the district court nevertheless struck Plaintiffs' disparate impact

---

[2] The district court did not address in its ruling Plaintiffs' additional argument that the notice provision simply did not apply, because Plaintiffs' claims arise out of their right to be free from discrimination, *not* from the language of the membership agreement itself. *See* Dist. Ct. ECF No. 75 at 26 (collecting cases).

class claims—claims based on the same data-based allegations as the disparate impact claims it had sustained as to the individual plaintiffs. The sum total of the Court's explanation was as follows: "Because the circumstances of each plaintiff's loan application process are so varied, and to promote the efficient use of resources and to streamline the claims to be considered in this civil action, the Court will strike the class allegation and allow the nine plaintiffs to proceed on their federal ECOA and FHA disparate impact claims under Case No. 1:23-cv-1731 (LMB/WEF) or permit them to proceed individually." JA122.

## ARGUMENT

### I. Class Allegations Cannot Be Struck Absent Finding That No Set Of Facts Could Possibly Support Class Action

This Court has not expressly articulated either the substantive standard a district court should apply when deciding whether to strike class allegations based solely on the pleadings, or the Court of Appeals' standard of review. However, both are clear.

**<u>Substantive Standard</u>**. To strike class allegations at the pleading stage, a court must find that, even drawing all reasonable inferences in plaintiffs' favor, no set of facts exists that could possibly support a class action. As the First Circuit explained, "a court should typically await the development of a factual record before determining whether the case should move forward on a representative basis" because striking class allegations is only appropriate if the action "cannot possibly

move forward on a class-wide basis." *Manning v. Bos. Med. Ctr. Corp.*, 725 F.3d 34, 59 (1st Cir. 2013). Other courts to consider the question have agreed. *See*, *e.g.*, *Pittman v. E. I. duPont de Nemours & Co.*, 552 F.2d 149, 150 (5th Cir. 1977) ("a certain amount of discovery is essential in order to determine the class action issue and the proper scope of a class action [and] the plaintiff is entitled to some leeway in attempting to define the proper parameters of his proposed class."); *Ehrhart v. Synthes (USA)*, No. CIV.A. 07-01237(SDW), 2007 WL 4591276, at *4 (D.N.J. Dec. 28, 2007) ("the usual practice favoring pre-certification discovery derives from the fundamental premise of Fed. R. Civ. P. 12, which is that claims, including class claims, should not be dismissed on the pleadings unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.); *Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 949 (6th Cir. 2011) (only affirming district court's striking of class allegations at the pleading stage where "no proffered or potential factual development offer[ed] any hope of altering [a legal] conclusion…that generally will preclude class certification"); *Sanders v. Apple Inc.*, 672 F. Supp. 2d 978, 990 (N.D. Cal. 2009) (district court must abstain from striking class allegations at pleading stage unless the court is "convinced that any questions of law are clear and not in dispute, and that under no set of circumstances could the claim[s]" succeed in class action form).

This strong presumption against striking class allegations at the pleading stage

12

is consistent with the well-established principle that a court should defer ruling on class certification until the record is properly developed enough for the court to perform the "rigorous analysis" mandated by Rule 23. *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982). *See also*, *e.g.*, *Monreal v. Potter*, 367 F.3d 1224, 1238 (10th Cir. 2004) ("Granting or denying class certification is a highly fact-intensive matter of practicality."). For this reason, the vast majority of courts to consider the issue have expressed their disfavor for ruling on class certification at the pleading stage; i.e., before allowing the record to develop and drive the contours of the proposed class.[3]

**Standard of Review.** While, as a general proposition, motions to strike under Rule 12(f) are often reviewed under the abuse of discretion standard, *United States v. Ancient Coin Collectors Guild,* 899 F.3d 295, 324 (4th Cir. 2018), where, as here,

---

[3] *See, e.g.*, *Damasco v. Clearwire Corp.*, 662 F.3d 891, 897 (7th Cir. 2011) ("a court may abuse its discretion by not allowing for appropriate discovery before deciding whether to certify a class"); *Graves v. Sw. & Pac. Specialty Fin., Inc.*, 2013 WL 5945851, at *2 (N.D. Cal. Nov. 4, 2013) ("motions to strike class allegations are disfavored because a motion for class certification is a more appropriate vehicle for arguments pertaining to the class allegations"); *Chaney v. Crystal Beach Cap., LLC*, 2011 WL 17639, at *2 (M.D. Fla. Jan. 4, 2011) (the "shape and form of a class action evolves only through the process of discovery, and it is premature to draw such a conclusion before the claim has taken form'"); *Ehrhart v. Synthes (USA)*, 2007 WL 4591276, at *5 (D.N.J. Dec. 28, 2007) (collecting cases and explaining that "the better course is to deny such a motion because the shape and form of a class action evolves only through the process of discovery"); *Wright, Miller & Kane, Federal Practice & Procedure Civil* § 1785.3 (3d. 2005) ("the court's [certification decision] usually should be predicated on more information than the complaint").

a district court's conclusion subject to review is a legal one "based solely on the pleadings and supporting materials," this Court's review of the district court's decision is de novo, *Korb v. Lehman*, 919 F.2d 243, 246 (4th Cir. 1990); *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 339 (4th Cir. 2021) (legal conclusions reviewed de novo). Under any standard, the Court's decision represents clear error and should be reversed.

## II. Plaintiffs Support The Plausible Existence Of Class Claim

### A. Plaintiffs Stated Disparate Impact Discrimination Claim as to Themselves

As the district court recognized, Plaintiffs state a claim as to race-based disparate impact claim as to themselves. JA116. That portion of the District Court's decision was well-supported.

To sustain a disparate impact claim at the motion to dismiss stage, a complaint must allege (1) a disparate impact on the protected class; (2) a specific policy of the defendant; and (3) a causal connection between the policy and the disparate impact. *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 424-425 (4th Cir. 2018). Substantial statistical anomalies caused by defendants' actions will make the "disparate impact of the policy 'self evident.'" *Id.* (*citing Betsey v. Turtle Creek*, 736 F.2d 983, 988 (4th Cir. 1984)); *see also Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 527 (2015) (prima facie case of disparate impact typically shown by statistical analysis showing a racial or other

disparity across all those who experience a common policy).

Plaintiffs alleged that Navy Federal employs the same underwriting process for all applicants, and that three separate studies indicate that this uniform underwriting process has created a racially disparate impact – an impact unmatched by any other major home mortgage lender. JA044-51 ¶¶ 63-68, 83

The district court—identifying the existence of (1) a disparate impact, (2) a specific policy, and (3) a connection between that policy and the disparate impact (*accord Reyes*, 903 F.3d at 424-425)—rightly found that the plaintiffs had identified a disparate impact *as to plaintiffs themselves*:

> At the motion to dismiss stage, the Complaint has sufficiently pled a claim for disparate impact under the FHA and ECOA because it meets the requirements to state a claim: the statistical disparities reveal a disparate impact among non-white loan applicants and the underwriting algorithm and process is alleged to have caused the disparity. If during discovery plaintiffs are unable to link the described "secret" underwriting process to the precise disparities and adverse consequences experienced by the borrowers—taking into consideration their individualized application criteria—then the Court may revisit whether the claim can survive at summary judgment.

JA116.

The district court's decision in this respect was no outlier: Plaintiffs' factual presentation linking a particular underwriting policy with a statistically significant racially disparate outcome was in accord with other cases in which courts have determined that plaintiffs have successfully alleged a disparate impact. *Cf. Montgomery Cnty., Maryland v. Bank of Am. Corp.*, 421 F. Supp. 3d 170, 183–84

(D. Md. 2019) (identification of "set of related statistical disparities" sufficient to demonstrate a disparate impact); *Nat'l Fair Hous. All. v. Bank of Am., N.A.*, 2023 WL 2633636, at *7 (D. Md. Mar. 24, 2023) (denying summary judgment and finding that "[a] disparity is sufficiently significant if it demonstrates a statistically and practically significant discrepancy between valid comparative populations") (cleaned up); *Cnty. of Cook v. HSBC N. Am. Holdings Inc.*, 314 F. Supp. 3d 950, 967 (N.D. Ill. 2018) (defendant bank's underwriting behaviors considered a "policy" sufficient to support a disparate impact claim); *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 281 (W.D. Tex. 2007) (certifying class where the plaintiffs' claim was based on defendant's "policy of using a particular credit scoring algorithm, which plaintiffs allege has a disparate impact on minorities"); *Prince George's Cnty., Maryland v. Wells Fargo & Co.*, 397 F. Supp. 3d 752, 766 (D. Md. 2019) (challenge to "equity stripping" policies sufficient to sustain a disparate impact claim).

## B.     The District Court's Internally Inconsistent Ruling Relied On Impermissible Fact-Finding

Nevertheless, in rejecting Plaintiffs' class allegations, the district court engaged in impermissible fact-finding in violation of Rule 12, and issued a ruling inconsistent with its own legal conclusions.

Plaintiffs allege that all loan applicants—not only the named plaintiffs—faced the *same* "semi-automated" underwriting policy, JA044-46 ¶¶63-68, and that it is this underwriting policy that leads to the disparate impact so starkly shown by

16

multiple statistical analyses. In short, the process described in the CAC is not a "varied" one.

Ignoring the requirement that it accept "all well-pleaded allegations in the plaintiff's complaint as true and [draw] all reasonable factual inferences from those facts in the plaintiff's favor," *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999), the district court decided to strike the class allegations based on its own view that "the circumstances of each plaintiff's loan application process are so varied." JA122. While the district court did not elaborate regarding what constitutes differing "circumstances" in a loan application process, what it apparently concluded was that the "loan application process"—i.e., the underwriting undertaken, and the variables considered—was not, as a factual matter, as uniform as Plaintiffs claim.

But the district court is not permitted to engage in such a factual evaluation of the accuracy of plaintiffs' description of Navy Federal's underwriting process—a process, again, the very same district court recognized plausibly created a disparate impact as to the named plaintiffs. As detailed in the CAC, plaintiffs allege that Navy Federal applies the same underwriting algorithm to all loan applications, and that Navy Federal solicits the same kind of material from all loan applicants through a Uniform Residential Loan Application form. JA044-45 ¶¶ 63-65. The district court was not permitted to freelance, and through its own supposition determine that there exists additional, ultimately dispositive "variability" to the underwriting process that

necessarily precludes a class claim.

Indeed, such factfinding at the pleading stage, where that factfinding underpins the Court's reasoning for its ruling, is reason enough for reversal. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 449 (4th Cir. 2011). *Kolon Industries* is instructive. There, this Court considered a district court's dismissal of a counterclaim where that dismissal was based, in part, on alleged admissions of counsel made in open court outside the scope of the pleadings regarding the existence of certain relevant agreements. The Court of Appeals reversed, holding that the district court fundamentally erred when it simultaneously accepted those purported admissions as true, and then made "inferences on that basis" in favor of the counterclaim-defendant. *Id*.

The district court's ruling here was based on even larger inferential leaps. The district court, *on its own*, determined that Defendant's underwriting "process" was more "varied" than the process described in Plaintiffs' complaint. And then, again on its own, the district court decided, based on that that injected "fact" of variability, that no class claims could succeed. If, in *Kolon*, a district court's crediting of factual admissions by counsel represented impermissible fact-finding, then surely its inferential reasoning drawn from its *own* factual assumptions – assumptions that directly contradict the CAC's allegations – would be as well.

Further, the internal inconsistency underpinning the district court's ruling

remains clear: where plaintiffs *can* successfully allege that a Navy Federal loan underwriting process—a uniform procedure involving uniform lending criteria applied to all borrowers—harms *the named plaintiffs* due to the named plaintiffs' racial makeup, there is no cause for the Court to find that there exists no set of facts in which that same policy, applied to all borrowers, similarly harms absent class members.

### C.    Existence Of Some Variables Is No Barrier To Class Certification

To the extent the district court's decision[4] is based on the observation that multiple variables go into a loan application—e.g., plaintiffs may have different credit scores, incomes, loan-to-value ratios, etc.—that is no barrier to class certification.

As an initial matter, disparate impact liability is premised on the notion that disparate impacts can occur due to the blind application of purportedly race-neutral criteria. In that way, the claim "permits plaintiffs to counteract unconscious prejudices and disguised animus that escape easy classification as disparate treatment." *Inclusive Communities*, 576 U.S. at 521. This includes cases where the criteria at issue are influenced by a wide variety of inputs, often brought as class

---

[4] Again, the sum total of the District Court's justification for striking the class allegation is the following subordinate clause: "Because the circumstances of each plaintiff's loan application process are so varied . . . ." JA122.

actions. *See*, *e.g.*, *DeHoyos*, 240 F.R.D. at 275 (certifying class alleging deficiencies in defendant's credit scoring procedure employing substantial number of purportedly race-neutral variables); *Huskey v. State Farm Fire & Cas. Co.*, No. 22 C 7014, 2023 WL 5848164 (N.D. Ill. Sept. 11, 2023) (sustaining class claim for disparate impact based on insurer's use of algorithmic decision-making tool with dozens of variables used to predict insurance claim fraud); *Louis v. Saferent Sols., LLC*, 685 F. Supp. 3d 19, 38 (D. Mass. 2023) (sustaining disparate impact class claim where plaintiffs alleged that defendant, which produced a numerical score based on multiple variables to determine viability of applicants for rental units, used an algorithm that over-relied on credit score and credit history).

Indeed, disparate impact claims "are well suited for classwide adjudication: the policy either disparately impacted the plaintiff class or it did not." *Simpson v. Dart*, 23 F.4th 706, 712 (7th Cir. 2022); *see also Brown v. Nucor Corp.*, 785 F.3d 895, 917 (4th Cir. 2015) (reversing district court's denial of class certification where common policy caused statistically significant disparate impact); *Cooper v. S. Co.*, 390 F.3d 695, 724 (11th Cir. 2004) ("In general terms, disparate impact cases are more amenable than other types of discrimination claims to class treatment, since they arise out of specific policies or practices that have a disproportionate impact on an entire class of employees.")

Nor would the district court's decision be justified if it were reframed as a

concern with the Plaintiffs' ability to establish commonality or typicality under Rule 23(a). It is well-settled that questions of commonality and typicality "generally involve[] considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). Those issues are "more prudently reserved for a fully briefed class certification motion rather than in the context of a motion to strike class claims at the pleading stage." *Glass v. Tradesmen Int'l, LLC*, 505 F. Supp. 3d 747, 765 (N.D. Ohio 2020); *see also*, *e.g.*, *Williams v. State Farm Mut. Auto. Ins. Co.*, No. 20 CV 1121, 2023 WL 5748421, at *6 (N.D. Ill. Sept. 6, 2023) (refusing to strike disparate impact class allegations due to disagreement regarding "variant circumstances" of purported decision-making because "[s]triking the class allegations at this stage, without the benefit of class discovery, would be premature"); *Chen-Oster v. Goldman, Sachs & Co.*, 877 F. Supp. 2d 113, 117 (S.D.N.Y. 2012) (any motion to strike class allegations where motion raises "issues that would be decided in the motion for class certification" is premature).[5]

_____

[5] *See also*, *e.g.*, *Cholakyan v. Mercedes-Benz USA, LLC*, 796 F. Supp. 2d 1220, 1245 (C.D. Cal. 2011) (collecting cases and explaining it is "rare" to strike class allegations "in advance of a motion for class certification"); *In re Saturn L–Series Timing Chain Prods. Liab. Litig.*, No. MDL 1920, 08:07CV298, 08:08CV79, 2008 WL 4866604, *24 (D.Neb. Nov. 7, 2008) ("While Defendants note potential difficulties this Court may face in defining the class, these concerns do not justify a

Finally, and only underscoring just how premature the striking of class allegations is here, even a more "varied loan application process" than what is presented in the CAC would not preclude class certification of any potential classes. For example, all that is needed to cross the low threshold of establishing commonality is "the existence of a single issue of law or fact that is common across all class members," and commonality is "thus easily met in most cases." 1 *Newberg and Rubenstein on Class Actions* § 3:18 (6th ed.). And while the predominance requirement "calls upon courts to give careful scrutiny to the relation between common and individual questions in the case," the "entire notion of predominance implies that the plaintiffs' claims need not be identical, and . . . a class can meet this requirement even though other important matters will have to be tried separately." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 658 (4th Cir. 2019) (cleaned up). Predominance would thus be defeated only if, for example, issues concerning

---

premature dismissal of all class allegations prior to the class certification stage. Defendants' arguments in support of premature dismissal are not persuasive since the cases they cite warranted premature dismissal on grounds that do not exist in this case. Even where 'plaintiffs' class definitions are suspicious and may in fact be improper, plaintiffs should at least be given the opportunity to make the case for certification based on appropriate discovery of, for example, the ... lists that they claim will identify the class members,'" citing *In re Wal–Mart Stores, Inc. Wage & Hour Litig.*, 505 F. Supp. 2d 609, 615 (N.D. Cal. 2007); *Cf In re NVIDIA GPU Litig.,* No. C 08–04312 JW, 2009 WL 4020104, *13 (N.D.Cal. Nov. 19, 2009) ("A determination of the ascertainability and manageability of the putative class in light of the class allegations is best addressed at the class certification stage of the litigation").

variability in the application process (a process Plaintiffs plausibly allege *is uniform*) in fact rise to the level that utterly overwhelms the central common issues in this litigation. Of course, even then, the district court can employ multiple tools to manage any issues arising from such variability, and such purported variability would be no hindrance to certification of an injunctive-relief class.

A real-world example of this principle can be found in *Buycks-Roberson v. Citibank Fed. Sav. Bank*, 162 F.R.D. 322 (N.D. Ill. 1995). There, plaintiff home loan applicants were seeking recompense for alleged racial discrimination in connection with defendant Citibank's home loan application approval process. Citibank allegedly allowed too much discretion on the part of its loan officers to apply underwriting factors, leading to racially disparate results. *Id*. at 331. While the court found that variability of individual circumstances made damages calculation difficult—different individuals had different loan officers—it certified a class under Rule 23(b)(2), and bifurcated the litigation into a liability phase, at which point injunctive relief could be fashioned, and a damages phase, in which a special master could be appointed to determine individual claimants' damages (if any). *Id*. at 337; *see also*, *e.g.*, *Fischer v. Dallas Fed. Sav. & Loan Ass'n*, 106 F.R.D. 465, 467 (N.D. Tex. 1985) (certifying class of mortgage loan applicants for purposes of injunctive relief); *Coleman v. General Motors Acceptance Corp*., 220 F.R.D. 64 (M.D. Tenn. 2004) (certifying class of African American consumers alleging ECOA violation

relating to disparate impact in credit financing pursuant to Rule 23(b)(2)). The CAC also specifically seeks certification pursuant to Rule 23(b)(2). JA075 ¶ 253.

To be clear, it is too early to opine on whether bifurcation or other procedural steps are necessary or appropriate in this case, but *Buycks-Roberson* and the other cases above demonstrate that district courts have many flexible tools for dealing with individualized issues at trial in a class proceeding, and certainly stand for the proposition that the district court's determination that the CAC presents *no possible ground* for class certification was clearly erroneous.

Indeed, even if the court had concerns about Plaintiffs' ability to represent class members with differing qualifications for home loans, those concerns do not justify the drastic measure of permanently striking the class allegations in their entirety. *Cf. Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 563 n.8 (2007) ("[W]hen a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder."). Rather, the district court has many tools at its disposal to address concerns regarding the appropriate contours of the putative class, including redefining the class during the certification process or creating subclasses. *Cf. Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012) (problems arising from class definitions "can and often should be solved by refining the class definition rather

than by flatly denying class certification on that basis"); *Costa v. Dvinci Energy, Inc.*, 342 F.R.D. 38, 40 (D. Mass. 2022) (denying motion to strike class allegations and recognizing court has ability to refine class definition); *Fengler v. Crouse Health Found., Inc.,* 595 F. Supp. 2d 189, 197 (N.D.N.Y. 2009) (granting class certification in hospital compensation case, but excluding "non-patient care workers," such as cafeteria workers and security staff, because plaintiffs failed to show that these employees worked without pay with hospital administrators' knowledge).

## CONCLUSION

Plaintiffs adequately alleged a disparate impact as to themselves. Respectfully, they have done so for absent class members as well. Accordingly, the Court should reverse the district court's Order striking Plaintiffs' class allegations.

Dated: September 10, 2024          Respectfully submitted,

*/s/ Glenn E. Chappell*
Glenn E. Chappell                  Adam J. Levitt
Hassan A. Zavareei                 Daniel R. Schwartz
Shana Khader                       **DiCELLO LEVITT LLP**
**TYCKO & ZAVAREEI LLP**           Ten North Dearborn Street
2000 Pennsylvania Avenue NW        Sixth Floor
Suite 1010                         Chicago, Illinois 60602
Washington, D.C. 20006             Tel. 312-214-7900
Tel. 202-973-0900                  alevitt@dicellolevitt.com
gchappell@tzlegal.com              dschwartz@dicellolevitt.com
hzavareei@tzlegal.com
skhader@tzlegal.com                Ben Crump
                                   **BEN CRUMP LAW PLLC**
                                   122 South Calhoun Street
                                   Tallahassee, Florida 32301
                                   Tel. 850-224-2020
                                   ben@bencrump.com

Michael Dunn                       Glen L. Abramson
**MILBERG COLEMAN**                **MILBERG COLEMAN**
**BRYSON**                         **BRYSON**
**PHILLIPS GROSSMAN,**             **PHILLIPS GROSSMAN, PLLC**
**PLLC**                           800 South Gay Street, Suite 1100
900 West Morgan Street             Knoxville, Tennessee 37929
Raleigh, North Carolina 27603      Tel.  866-252-0878
Tel. 919-600-5000                  gabramson@milberg.com
michael.dunn@milberg.com

*Counsel for Plaintiffs-Appellants*

26

**CERTIFICATE OF SERVICE**

I hereby certify that on September 10, 2024, I electronically filed the foregoing petition with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


Dated: September 10, 2024                    */s/ Glenn E. Chappell*
                                             Glenn E. Chappell

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I hereby certify that:

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,077 words, excluding the parts of the petition exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in 14-point Times New Roman font.

Dated: September 10, 2024                    */s/ Glenn E. Chappell*
                                            Glenn E. Chappell
                                            *Counsel for Plaintiff-Appellees*